BLANK ROME, LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

**08 CV 2352**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.K. INTERNATIONAL PTY LTD., | 08 Civ. |
| Plaintiff, | **VERIFIED COMPLAINT** |
| v. | |
| STX PAN OCEAN CO. LTD., | |
| Defendant. | |

Plaintiff J.K. INTERNATIONAL PTY LTD. ("JKI"), by its attorneys Blank Rome, LLP, complaining of the above-named Defendant STX PAN OCEAN CO. LTD. ("STX"), alleges upon information and belief as follows:

1.      This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1333. The Court has subject matter jurisdiction and relief is likewise sought under 9 U.S.C. 8.

2.      At all material times, J.K. INTERNATIONAL PTY LTD. was and now is a foreign company organized and existing under the laws of Australia.

3.     At all material times, defendant STX was and now is a corporation organized and existing under the laws of Korea and the owner or disponent owner of the Motor Vessel M/V YONGAN 3 (the "Vessel").

## THE BASIC FACTS

4.     As set out in the "Claims Submissions" dated February 1, 2008 ("Submissions"), filed in respect of a London maritime arbitration, attached as Exhibit 3 to the accompanying Rule B affidavit, JKI chartered the Vessel pursuant to a charter dated January 4, 2007 (the "Charter").

5.     The Charter provides for London arbitration.

6.     JKI alleges that STX breached the Charter and has submitted those disputes, as set out in the Submissions, to the London Arbitration, claiming damages in the total sum of $1,156,935 plus compound interest and costs.

## COUNT I

## RULE B RELIEF

7.     Plaintiff repeats paragraphs 1 through 6 as if fully set forth herein.

8.     Plaintiff seeks issuance of process of maritime attachment so that it may obtain security for its claims including its English attorneys' fees and arbitrators' fees which are routinely awarded in London arbitration and no security for Plaintiff's claim has been posted by STX or anyone acting on its behalf to date.

9.     At best as can now be estimated, Plaintiff expects to recover the following amounts in the arbitration:

| A. | On the principal claim | $1,156,935 |
| B. | Estimated Recoverable English Lawyers and Arbitrators' Fees & "Costs" | $ 475,000 |
| C. | Interest over the course of 4 years at prime rate average of 8% per annum: | $ 370,219 |
| | **TOTAL:** | $2,002,154 |

10.    Defendant cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"), but is believed to have, or will have during the pendency of this action, assets in this jurisdiction.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against STX, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That since STX cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of STX's tangible or intangible property or any other funds held by any garnishee, which are due and owing to STX up to the amount of $2,002,154 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B, answer the matters alleged in the Verified Complaint;

C.    That this Court retain jurisdiction over this matter through the entry of a judgment or award associated with the pending claims including appeals thereof.

     D.     That Plaintiff may have such other, further and different relief as may be

just and proper.

Dated: New York, NY
       March 6, 2008

                           Respectfully submitted,
                           BLANK ROME, LLP
                           Attorneys for Plaintiff

                           By
                           Jeremy J.O. Harwood (JH 9012)
                           405 Lexington Avenue
                           New York, NY 10174
                           Tel.:  (212) 885-5000

## VERIFICATION

STATE OF NEW YORK          )
                                                     : ss.:
COUNTY OF NEW YORK      )

Jeremy J.O. Harwood, being duly sworn, deposes and says:

1.      I am a member of the bar of this Honorable Court and of the firm of Blank Rome, LLP, attorneys for Plaintiff.

2.      I have read the foregoing Complaint and I believe the contents thereof are true.

3.      The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.      The sources of my information and belief are documents provided to me and statements made to me by representatives of Plaintiff.

Jeremy J.O. Harwood

Sworn to before me this
6th day of March 2008

Notary Public

NEAL MITCHELL
Notary Public, State of New York
No. 01MI6114408
Qualified in New York County
Commission Expires Aug. 16, 20__

601768.00601/6621854v.1                                    5

BLANK ROME, LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.K. INTERNATIONAL PTY LTD., <br><br>                    Plaintiff, <br><br>        v. <br><br> STX PAN OCEAN CO. LTD., <br><br>                  Defendant. | 08 Civ. <br><br> **AFFIDAVIT UNDER** <br> **SUPPLEMENTAL RULE B** |

STATE OF NEW YORK     )
                                 : ss.:
COUNTY OF NEW YORK   )

     JEREMY J.O. HARWOOD, being duly sworn, deposes and says:

     1.     I am a member of the Bar of this Honorable Court and a member of the firm of Blank Rome, LLP, attorneys for the Plaintiff herein. I am familiar with the circumstances of the complaint and submit this affidavit in support of Plaintiff's request for the issuance of process of maritime attachment and garnishment of the property of defendant STX PAN OCEAN CO. LTD., as Owner of the M/V YONG AN 3, a company organized and existing under the laws of Korea, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

2.     I reviewed STX's website (www.panocean.com) which contains a listing of "Overseas Offices" under the webpage entitled "Network." Under the heading "North America" offices are listed in "New York, New Orleans, Portland." Exhibit 1 hereto.

3.     The contact details provided on the website for the "New York" office, Exhibit 2 hereto, are:

> Panobulk America Inc.
> 201 Route 17 North, 3rd Floor
> Rutherford, New Jersey 07070, USA

4.     Under the address of Panobulk America Inc. ("Panobulk") are listed New Jersey areas codes (201) for its telephone and fax numbers.

5.     The webpage further states:

> **Panobulk America** is a wholly owned subsidiary and the exclusive agent of STX Pan Ocean Co, Ltd., Seoul, Korea. Headquartered in the New York area and supported by STX Pan Ocean's U.S.A. based branch offices and extensive agency network, Panobulk America is largely responsible for managing STX Pan Ocean's affairs in North America, including most sales, and marketing functions, claims handling and prevention, as well as vessel operations in all major U.S.A., Canadian, Caribbean And Mexican Ports.

6.     Neither defendant nor Panobulk is not incorporated or registered to do business in this State.

7.     Under my supervision, my office did a search of the New York State Secretary of State, Division of Corporations, Transportation Tickler (2007 edition), telephone assistance in New York City, and the internet Yellow Pages.

8.     In our search, we did not find any listing or reference to defendant or Panobulk in this district or state.

9.    In the circumstances, I believe the defendant cannot be "found" within this district.

10.    I attach as Exhibit 3 hereto a copy of the submissions in the London arbitration.


Jeremy J.O. Harwood

Sworn to before me this
6th day of March, 2008

Notary Public

NEAL MITCHELL
Notary Public, State of New York
No. 01MI6114408
Qualified in New York County
Commission Expires Aug. 16, 20__

# EXHIBIT 1



| **STX News**    **O** | **STX Pan Ocean** | **Business** | **Fleet Information** | **IR Center** |

**STX Pan Ocean**     *Overview*     Home ╱ STX Pan Ocean ╱ Ab

**· About Us**

**▌ PROFILE**

➡ *Overview*
*Organization*

*Chairman*

*CI*

*Network*

*STX Pan Ocean builds a brighter*
*Future for you*

**· Company Name** : STX Pan Ocean Co., Ltd.
**· Head Office** : STX Namsan Tower, 631 Namdaemunno 5-ga, Jung-gu
**· Incorporation** : May 28, 1966
**· Representative** : Mr. Kang Duk Soo, Chairman
                    Mr. Lee Jong Chul, Vice Chairman & CEO
                    Mr. Kim Dae Yoo, President

**· Paid - in Capital** : US$ 133,995,000
**· Annual Turnover** : US$ 2,947,802,000
**· Main Business** : Sea Transportation
**· No. of Employees** : Total 1,859(Shore: 492, Crew: 1,397)
**· Owned Fleet** : 59Ships
**· Chartered Fleet** : About 200Ships at any given time

**· Sales & Profit**

|                      | **2004**  | **2005**  |
|----------------------|-----------|-----------|
| *Sales*              | 2,263,255 | 2,721,084 |
| *Operation Income*   | 273,654   | 287,438   |
| *Net Profit*         | 163,629   | 279,843   |

**▌ HISTORY**

**· 2nd Startup**

2012    -Majority shareholder changed to STX Shipbuilding Co.,
        -Renamed as STX Pan Ocean Co., Ltd. and announced i
        -start i±

**· Development**

2000  2001    -Carried total bulk cargo of 75 million tons and recorded
              USD 1.31 billion. Credit Banks agreed debt-equity-swap
              -230billion (equivalent to USD177million) which effected
              -2002.
              -Emerging from the court-receivership as from 21st Ma

1988  1995    -Expanded breakbulk liner service to the area ranging fr
              -North/South Americaand Europe to Far East & South E
              -carrying steel products.
              -Acquired four modern Pure Car and Truck Carriers thro
              -building eachwith a carrying capacity of 6,500 units, m
              -formal entry into the PCTC market.

1983  1987    -Renamed the company Pan Ocean Shipping Co. Ltd.(P(
              -April 1, 1984.
              -Merged with Global Shipping Company, Samick Lines a
              -ShippingCompany in line with the Korean government'
              -guidelines designed torationalize oceangoing shipping i
              -Established new breakbulk liner service from Indonesia
              -S.E. Asian countries to U.S.A., Europe, Far East and Mi
              -carrying wood and steel products.

1977  1982    -Began breakbulk liner service carrying Korean export p
              -products to the U.S.A and Canada.
              -Honored by the Korean government with the highly cov
              -achievement award for outstanding contributions to Ko
              -development every year consecutively through 1982.

1974  1976    -Awarded "LARGE-SCALE SHIPPING COMPANY" accredit
              Korean government, a position of honor unparalleled in
              -merchant  marine industry
              -Total fleet tonnage grew by 700,000DWT of 20 vessels

1972  1973    -Launched dry bulk tramper service
              -Augmented tanker fleet with 9 product carriers aggreg
              -54,200DWT

**· Establishment**

1966  1971    -Incorporation of Pan Ocean Bulk Carriers Ltd.(POBC)in
              -Purchased and began operation with 4 oil tankers of 5⁴
              -Placed a new building order for 324,000DWT class ULC

Copyright ⓒ 2005 STX Pan Ocean Co. Ltd. All Rights Reserved

# EXHIBIT 2





Home · STX Pan Ocean · Network · **Overseas Offices**

**STX Pan Ocean**

*Overseas Offices*

**New York**
Customer Offices Addresses

**Asia**
Tokyo
Shanghai
Dingdao
Tianjin
Hong Kong
Kaohsiung
Singapore
Jakarta
New Delhi
Xiamen

**Europe**
London
Antwerp
Odessa

**Australia**
Melbourne

**North America**
New York
New Orleans
Portland

**South America**
Santiago
Rio de Janeiro

:: STX Pan Ocean ::

Page 2 of 2

**About Us**

**Chairman**

**CI**

**· Network**

■ **Office in Korea**
■ **Overseas Offices**

*STX Pan Ocean builds a brighter Future for you*

⌃
*TOP*

**· Address**

PANOBULK AMERICA INC.
201 ROUTE 17 NORTH, 3RD FL.
RUTHERFORD, NEW JERSEY 07070, U.S.A.

**· E-Mail**

panobulkamerica@stxpanocean.com
newyork@stxpanocean.com

**· Tel**

<1>(201) 507-9952

**· Fax**

<1>(201) 507-9951

**Panobulk America** is a wholly owned subsidiary and the exclusive agent of STX Pan Ocean Co, Ltd., Seoul, Korea.Headquartered in the New York area and supported by STX Pan Ocean's U.S.A. based branch offices and extensive agency network, Panobulk America is largely responsible for managing STX Pan Ocean's affairs in North America, including most sales, and marketing functions, claims handling and prevention, as well as vessel operations in all major U.S.A., Canadian, Caribbean And Mexican Ports.

Copyright © 2000 *STX Pan Ocean Co. Ltd. All Rights Reserved*    **STX**PanOcean



**STX News**    ●    **STX Pan Ocean**    **Business**    **Fleet Information**    **IR Center**

## STX Pan Ocean

### Overseas Offices

Home / STX Pan Ocean / Network /

**About Us**

**Chairman**

**CI**

**▸ Network**

**Office in Korea**
**■ Overseas Offices**

STX Pan Ocean builds a brighter
Future for you

**New York**
Overseas Offices Address





• **Address**

PANOBULK AMERICA INC.
201 ROUTE 17 NORTH, 3RD FL.
RUTHERFORD, NEW JERSEY 07070, U.S.A.

• **E-Mail**

panobulkamerica@stxpanocean.com
newyork@stxpanocean.com

*• Tel*

<1>(201) 507-9952

*• Fax*

<1>(201) 507-9951

**Panobulk America** is a wholly owned subsidiary and the exclusive agent of S
Ltd., Seoul, Korea.Headquartered in the New York area and supported by STX
based branch offices and extensive agency network, Panobulk America is large
managing STX Pan Ocean's affairs in North America, including most sales, and
functions, claims handling and prevention, as well as vessel operations in all n
Canadian, Caribbean And Mexican Ports.

*Copyright © 2005 **STX Pan Ocean** Co., Ltd. All Rights Reserved.*

# EXHIBIT 3

**IN THE MATTER OF AN ARBITRATION**

**AND**

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**B E T W E E N**

**J.K. INTERNATIONAL PTY Ltd, BRISBANE, AUSTRALIA**

**Claimants/Charterers**

**AND**

**STX PAN OCEAN Co. Ltd, SEOUL, KOREA**

**Respondents/Disponent Owners**

*"MV YONGAN 3"*
*C/P dated 4 January 2007*

---

**CLAIM SUBMISSIONS**

---

## A.    The Charterparty

1.    On 4 January 2007, STX Pan Ocean Co. Ltd, Seoul Korea (**"Disponent Owners"**) chartered *Mv "Yongan 3"* ("the **Vessel**") to J.K. International Pty Ltd, Brisbane, Australia (**"Charterers"**). Collectively, Disponent Owners and Charterers are known as the **"Parties"**.

2.    The fixture recap (**Enclosure 1**) provided as follows:

> *"VSL IS SDSTBC AND IS SUITABLE FOR GRAB DISCHARGE...*
> *SUB STOW (PLEASE ADVISE STOW PLAN BASIS FULL CARGO PEAS IN*
> *BULK SF ABT 1.22 M3/MT)*
> *Via sp/s/a/b always afloat, always within IWL, one tct with grain in blk*
> *via Vancouver, to India/Bangladesh*
> *Hire USD 27,250 per day or pro rata including overtime"*

3.  Subsequently, an NYPE Charterparty dated 04 January 2007 was drawn up ("the **Charterparty") (Enclosure 2)**. The material terms as recorded in the said Charterparty are as follows:

   *Lines 13-15"...Owners to agree to let and the said Charterers agree to hire the said vessel from the time of delivery, for about 55-65 days without guarantee, via safe port(s), safer berth(s), safe anchorage(s), always afloat, always within IWL one time Charter Trip with grain in bulk **via Vancouver, to India /Bangladesh..." (our emphasis added)***

   *Line 41      "...when the vessel puts into port for causes for which the vessel is responsible, then all such charges incurred shall be paid by the Owners..."*

   *Line 77      "...The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment..."*

   *Line 97- 101 "That in the event of the loss of time from deficiency and/or default of Owners...or by any other cause preventing the full working of the vessel, or any extra delay in consequence thereof the payment of hire shall case for the time thereby lost.. and the cost or any extra fuel consumed in consequence thereof and all extra expenses...shall be deducted from the hire..."*

   *Clause 48.  Cargo Exclusions*

   *"Only bulk cargoes are allowed and following to be excluded:  all dangerous, inflammable, injurious, hazardous and corrosive cargoes, goods/commodities as listed in the latest IMDG Code 1994 Consolidated Edition and/or any subsequent modification/amendments thereof, as well as listed on the BC Code Appendix (b) (but coal is always allowed), acid, alumina, ammonium nitrate, ammonium sulphate, ammunition, arms, asbestos, asphalt, black powder, bones and meatbone meal, borax, bulk milled rice, bulk rice, bulk wheat flour, calcium carbide, calcium hypochlorite, carbon black, caustic soda, cement, cement clinker, charcoal, charcoal in gunny bags, all kinds of concentrates, copra and/or its products, cotton, creosoted goods, deck cargo, direct reduced iron/HBI/ore briquettes lumps/pellets, dynamite, explosives of any kind including blasting caps, and detonators, ferro manganese, ferro-silicon, fishmeal,*

*fluorspar, fuels, grain products for direct human consumption, harmful and corrosive fertilizers, logs of any kind, hides, Indian coals, livestock, loaded bombs, military equipment and war material of any kind, motor spirits, naphtha, no IMO dangerous cargoes, nuclear fuel or substances or radioactive material of any kind and/or their wastes, petroleum coke, petroleum or its products, pig iron, pyrites, ore pellets, overweight cargo, pitch in bulk or drums, quebracho extracts, quick lime, railway wagons, resin, salts, saltcake, sand, silica sand, rutile, ilmenite, synthetic rutile, leucoxene, podumene sands, scrap including motor blocks and turnings, metal boring and cuttings, all seed cakes including mechanically expelled and/or solvent-extracted meals/pellets/expellers, shavings, silicon manganese, sludge ore, soda ash, sponge iron/pre-reduced iron, sugar (only raw sugar allowed), sulphur, sunflower seed expellers, tar, TNT, tobacco, turpentine, waste paper, wet hides, zinc ashes, zircon sands, the cargo of which the nature could affect the safety of vessel, crew and cargo loaded board and cargo which requires lashing, securing/dunnage including steel products.*

*All seed meals/pellets/expellers' – per Owners above clause but only.*

*Soya bean meals and soya bean pellets is allowed, with Owners clause as follows:*

*Soya bean meals and soya bean pellets are allowed provided a certificate from an independent laboratory/surveyor recognized by the competent authority of the country of shipment should be provided by the shipper, prior to loading and with actual analysis after loading, stating that the requirements for exemption are met as set out in the schedules for seed cake"*

*Clause 82. ARBITRATION CLAUSE*

"*Any dispute arising between Owners and Charterers under this Charter Party is to be referred to arbitration in London, one arbitrator to be appointed by Owners and the other by the Charterers, and in the case the arbitrators shall not agree then to the decision of an umpire to be appointed by them, the award of the arbitrators or the umpire to be final and binding on both parties.*"

*The arbitrators (and umpire, if appointed) are to be commercial men. If the two arbitrators' fail to agree upon an umpire, the president of the London Maritime Arbitrators 'Association is to nominate an umpire. This Charter Party is to be governed by, and arbitration hereunder is to be decided in accordance with, English Law.*

## B. JURISDICTION AND APPLICABLE LAW

4.    There is no dispute between the Parties regarding the appropriate forum or jurisdiction. The subject Charterparty clearly provides for any dispute to be settled by arbitration and the dispute to be governed by English law.  Pursuant to the underlying arbitration provisions, Charterers appointed Mr Patrick O'Donovan as their arbitrator and Disponent Owners appointed Mr Ian Kinnell as their arbitrator. Both arbitrators accepted their appointment subject to LMAA terms.

## C. MATERIAL FACTS

5.    On 5 January 2007, whilst the Vessel was enroute to Vancouver, Messrs Compass Marine,  wrote to the Master of the Vessel, with copy to Transworld Marine Express Pty Limited, Charterers Agent and Vessel operator (**"Charterers Agent"**) (**Enclosure 3**) and confirmed:

> *"...YR FINE VSL HAS BEEN FIXED TO LOAD A CARGO OF PEAS EX VANCOUVER..."*

> *"...CHARTERERS ARE TRYING TO PLAN THE CARGO, AND WOULD LIKE TO KNOW MAX CARGO VSL CAN LIFT TO HER SUMMER MARKS, LOADING PEAS WITH STOWAGE FACTOR OF ABT 42.5 CFT/MT".*

6.    A further message was sent on 7 January 2007, confirming the same and that a cargo of peas was to be loaded (**Enclosure 4**). A short while later, Charterers Agent wrote to the Master of the Vessel and provided detailed voyage instructions, **(Enclosure 5)** which included inter alia details of the voyage and the cargo to be loaded at Vancouver (the **"Voyage Instructions"**). Paragraph 2 of those Voyage Instructions, included the following instructions to the Master:

> *"Your vessel has been fixed for one time Charter trip of about 55-65 days, without guarantee, delivery dropping last outward sea pilot Long Beach ETR*

*17th January 2007, **to load a cargo of peas from Vancouver, Canada** for our Principals, Messrs J.K. International, Brisbane..." **(our emphasis added)***

7.    On 19 January 2007, as per the SOF prepared by Compass Marine and signed and stamped by the Master of the Vessel, the Vessel arrived at the Victoria Pilot Station, Vancouver, Canada **(Enclosure 6)**. At 18:00hrs on the same day the Master tendered a Notice of Readiness.

8.    On 20 January 2007, the ***"Vessel grain stability calculation"*** was approved by the port warden. A Further communication from Compass Marine confirming that Charterers intended to load *"Approx 4,381mt of split yellow peas"* was also sent to Master on the same day at 12:28hrs local time **(Enclosure 7)**.

9.    At 17:00hrs on the same day the Vessel commenced loading a cargo of **Canadian Whole Yellow Peas in Bulk**. For the avoidance of doubt, neither Charterers nor Charterers Agent received any form of protest from Disponent Owners as to the cargo being loaded and by 01:00hrs on 21 January 2007, the Vessel had loaded 5,845 Mt of Yellow Peas.

10.    However, at approximately **11:00hrs** on 22 January 2007, the Master was:

    *"INSTRUCTED BY PAN OCEAN TO STOP VESSEL FROM LOADING ADDITIONAL CARGO AND AWAIT FURTHER INSTRUCTIONS"*

11.    Thereafter, Charterers Agent received a communication from Disponent Owners which provided as follows (A full copy of this message is included at **Enclosure 8).**

    *"As far as we are concerned, Charterers cargoes to be loaded in Vancouver are peas in accordance with their sailing instruction whereas the Charter was concluded that the cargo to be loaded was GRAIN IN BULK"*

12.    Thereafter, Charterers Agent received further messages, which referred to an "alleged trading exclusion", which operated in the head charterparty and was in place between Disponent Owners and Owners and which prevented the Vessel from trading to Bangladesh.

13.    For the avoidance of doubt, Charterers and/or Charterers Agent confirm that at no time prior to fixing the Vessel were they made aware of any trading exclusion, nor was any such exclusion included within the subject Recap or Charterparty.

14.    Thereafter, Charterers received further communications from Disponent Owners, the content of which stated that if Charterers wanted to continue to load the cargo of peas in bulk, the only option available to them was to change their port of discharge from Bangladesh to other Indian ports.

15.    In the circumstances, Charterers lawyers were instructed to write to Owners broker and place Disponent Owners on notice of all financial losses which Charterers would incur should they agree to Disponent Owners demands. In reply to Charterers lawyers' letter, Charterers received various communications from Disponent Owners, which provided that Charterers were in breach of the charter by loading peas as peas in the vessel represented an **unlawful cargo.**

16.    Initially, Charterers refused to accede to Disponent Owners request as they considered the request oppressive, in breach of the subject Charterparty and prejudicial to their interests. However, Charterers were also mindful of their duty to mitigate any losses.  Charterers also wanted to take all steps to ensure the Vessel resumed loading at the earliest opportunity, rather than have the Vessel forced from the berth as a consequence of the cessation of loading. Had this occurred then this would have generated further claims from third parties.

17.    In the circumstances, Charterers having reserved all their rights and explicitly placed Disponent Owners on notice of their right to claim for all financial losses and expenses which Charterers would incur [1]as a consequence of the Vessel diverting from the nominated Voyage Instructions, took all available steps to find new buyers and for the Vessel to discharge in Mangalore and Kolkata.

18.    Following such communications from Charterers to Disponent Owners then, as outlined in the SOF, Owners instructed the Master to resume loading at 21:40hrs on 23 January 2007. Thereafter, in accordance with the Voyage Instructions and as confirmed in the SOF, the Vessel loaded a total cargo of 42,166,906 metric tons of yellow peas in bulk.

19. At 18:40hrs on 30 January 2007, the Vessel sailed from Vancouver to Singapore, where she loaded bunkers. Thereafter, the Vessel sailed to Mangalore and then to Kolkata where discharge of the cargo was concluded. Communications confirming the same are included at **Enclosure 9.**

20. In the circumstances, Disponent Owners breaches of the subject Charterparty in refusing to allow Charterers load a cargo of yellow peas at Vancouver and thereafter sail to Bangladesh and discharge the subject cargo at that port have resulted in Charterers suffering substantial loss and damage.

## D.   THE DISPUTE

21. The dispute principally concerns Disponent Owners failure to allow Charterers to carry a cargo of yellow peas in bulk to Bangladesh. Charterers case is that pursuant to the terms of the subject Charterparty:

    (a) The carriage of grain in bulk includes peas, which pursuant to Cl.48 (Cargo Exclusions) are a non-hazardous cargo and **not excluded** from carriage;

    (b) Trading to Bangladesh is not excluded by the recap and/or the Charterparty;

    (c) Charterers have previously fixed three NYPE Time Charterers with Disponent Owners, for the carriage of grain in bulk from Vancouver, Canada to Indian ports. On each occasion Charterers loaded and Disponent Owners carried (without any objection and/or restriction and/or reservation) a full cargo of peas from Vancouver, Canada to Chittagong and or other East Coast Indian ports; and

    (d) In any event, the Disponent Owners waived any right to reject the Charterers' orders to load peas at Vancouver and were not entitled to interrupt the Vessel's loading.

### (a)   CARRIAGE OF PEAS IN BULK

22. Disponent Owners have advised that Peas are not grain. However, for the purposes of grain in bulk, then peas and indeed all other pulses, barley, rice, peas etc with

---

[1] These financial losses included but were not limited to additional hire charges as a consequence of a substantially extended voyage, additional bunker costs, port expenses, lighterage costs, claims from third party buyers, plus all other incidental costs

behaviour similar to grain are defined for the purposes of the carriage of grain in bulk as **grain.**

23. In support of the same, Charterers will rely upon Cl. 89 "Grain Loading Certificate" which provides:

> "*The Owners guarantee that the vessel shall be suitable for carrying all kinds of grain in bulk*"

24. Grain is defined in the IMO Grain Rules  as

> "*wheat, maize, rye, oats, barley, rice, pulses or seeds and whether processed or not, which when carried in bulk has a behaviour characteristic similar to grain in that it liable to shift transversely across a cargo space of a ship*".

25. It is submitted that peas in bulk, have a behaviour characteristic similar to that of grain. In support of the same Charterers will rely upon Thomas' Stowage, (the properties and stowage of cargoes) 4th Edition,  which provides that the Grain regulations apply to the carriage of peas in bulk:

26. If any further support is needed to qualify the position that the carriage of grain encompasses peas then the Tribunal is invited to review the Canadian Grain Regulations, which provides within those regulations that Canadian peas are a grade of grain. A  Copy of Table 30, which includes "Peas and Beans" is  included at **Enclosure 10.**

27. In the premises, it is submitted that peas are a type of grain and  Disponent Owners actions in ordering the Master to cease loading and subsequently refusing to carry such a cargo to Bangladesh and forcing Disponent Owners to change their discharge port  represents  a clear breach of the subject Charterparty.

28. Further support for Charterers submission that Disponent Owners actions have breached the subject Charter can be found in the American decision of ***The Maria K. SMA 1324,*** whereby Owners refusal to load a cargo of petroleum coke, (which was not an excluded cargo) was found to be a breach of the subject charterparty.

**(b)    PREVIOUS TIME CHARTER FIXTURES**

29.  As provided for in paragraph 21(c) above, previous time charter fixtures for the carriage of peas in bulk between Vancouver and Indian Ports have included:

    *(i)*    *Mv Alex A – c/p dated 08.08.06*    **(Enclosure 11)**

    *(ii)*    *Mv Nepheli – c/p dated 11.08.06*    **(Enclosure 12)**

    *(iii)*    *Mv Skyros - c/p dated 21.10.06*    **(Enclosure 13)**

30.  For the purpose of this reference, the material clause included in each recap provided:

> *"one tct with grain in blk via Vancouver to India or EC India incl Tuticorin/Bangladesh"*

31.  Further, for each fixture, Charterers provided the Master with voyage instructions, the content of which provided (**included at Enclosures, 11, 12 and 13**) that the subject vessel was to:

> *"load a full cargo of peas from Vancouver, Canada for discharge at a nominated Indian port."*

32.  For each voyage the Master prepared a stowage plan, which provided for the stowage of peas in bulk. Further, Bills of Lading and/or Mates Receipts were drawn up and in each case, notwithstanding the cargo was *"Canadian peas in bulk"* notwithstanding that neither the Bills of Lading nor the Mates Receipts were claused by the Master and in each case the description provided was:

> *"a quantity of cargo in bulk said to be Canadian yellow peas"*

33.  Charterers submit that their previous fixtures with Disponent Owners confirms that it was implied from the charterparty, the implication of which was necessary in order to give business efficacy to the contract; and/or clear from a previous course of dealing between the Parties, as based on previous fixtures namely; *"Mv. Alex A"*, *"Mv. Nepheli"* and *"Mv. Skyros"*, that grain in bulk includes the carriage of bulk cargoes including yellow and green peas.

34.  In the circumstances, as previous evidence substantiates that Charterers have carried peas in bulk without objection then Disponent Owners must accept that peas are not an unlawful cargo nor is the carriage of such a cargo a breach of the subject Charterparty.

35.  Further or alternatively, the previous fixtures with Disponent Owners indicate that the parties negotiated the Charterparty on the agreed basis that peas were introduced within the meaning of "grain": see the *Karen Oltmann [1976] 2 Lloyd's Rep .708 at 612.* Further or alternatively, the Parties shared or the Disponent Owners acquiesced in the Charterers assumption that peas were included within the meaning of "grain" and the Disponent Owners were estopped by convention from contending that they were not.

### (C)   WAIVER

36.  In any event, by the time the Disponent Owners had received the Charterers' various communications indicating that peas were to be loaded (referred to at paragraphs 5 to 8 above) and had tendered Notice of Readiness and commenced loading peas, the Disponent Owners had waived the right to reject the Charterers' orders to load peas at Vancouver and were not entitled to interrupt the Vessel's loading: see *The Kanchenjunga* [1990] 1 Lloyd's Rep. 391 (HL) discussed in *Time Charters* (5th Ed.) at para.10.64.

### (d)   BANGLADESH AS DISCHARGE PORT

37.  Charterers submit that nothing in the recap or the subject Charterparty provides that Bangladesh is an excluded port. In particular, Cl. 52 provides for **Trading Exclusions** and as Bangladesh is not excluded, then in the premises, Charterers submit that pursuant to the Voyage Instructions they were entitled to order the Vessel to sail to Bangladesh to discharge the cargo loaded.

### E.   PARTICULARS OF LOSS AND DAMAGE

38.  As a consequence of Disponent Owners actions, Charterers incurred substantially increased voyage costs and contract cancellation charges

### A.   Voyage Costs

39.    Had Disponent Owners not breached the terms of the subject Charter and accepted that Charterers were entitled to carry peas and discharge that cargo in Bangladesh then the costs incurred by Charterers would have amounted to **US$2,051,515.75**. In support of the same, Charterers attach as **Enclosure 14** a copy of their original voyage calculation.

40.    However, as the Vessel was forced to discharge at the Port of Mangalore and the Port of Kolkata, then Charterers costs amounted to **US$2,913,450.87**. In support of the same Charterers attach as **Enclosure 15** a copy of their actual Voyage Costing. In the circumstances, the additional Voyage Costs incurred by Charterers amount to **US$861, 935.12**.

## B.    Cancellation charges

41.    As a consequence of the deviation to Mangalore and Kolkata, Charters were unable to fulfil their contractual requirements with buyers based in Bangladesh. In order to mitigate their losses Charterers had no option, but to settle their contractual liabilities and in doing so incurred losses of **US$295,000**. Evidence of the same is included at **Enclosure 16**.

## C.    Interest

42.    Further, Charterers claim compound interest paramount to Section 49 of the Arbitration Act 1996 for such period and at such rates and for such periods before and after any Award as the Tribunal may think fit.

43.    In the premises, Charterers claim:

    (a)    Damages incurred as a result of additional hire charges, bunkers and port stays in Mangalore and Kolkata, amounting **US$861, 935.12**; and

    (b)    Damages incurred as a consequence of the cancellation of their trade contract, which amounted to **US$295,000**; and

    (c)    Interest on the aforesaid claims pursuant to Section 49 of the Arbitration Act 1996 to be assessed for such period and at such rates and for such periods before and after any Award as the Tribunal may think fit.; and

    (d)    Costs (to be assessed by the Tribunal if not agreed).

44.  Charterers reserve their position to adduce further evidence and pleadings to support the sums due and owing should this be necessary in due course.

Signed ......................................

Dated ......................................